**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------X

SCELETIA EVANS, DERRICK BELL, YVETTE BURKE, BERNARDETTE HURTTE-REID, ERICA BROWN, ARIYANNA BROWN, SHANIYA FOSTER, DANIELLE LEE, BREONA SCOTT, FLIMEGRI MELANCON, JOHN GIBBS, and SHAWN MELANCON,

*Plaintiffs*,

-against-

LAWLER FOR CONGRESS, INC., THRESHOLD STRATEGIES, LLC, VICTORY FIELD OPERATIONS, LLC, VEN-VAMOS STRATEGIES, LLC, MOMENTUM X GROUP LLC, MIKE VINCENT LAWLER, *Individually*, ERIC RAMON DIAZ VASQUEZ, *Individually*, ANASTASIA YOPP, *Individually*, NADIR A. PEREZ, *Individually*, *Jointly and Severally*,

*Defendants.*

---------------------------------------------------------------------X

**Docket No.**

**COMPLAINT**

**PLAINTIFFS DEMAND A TRIAL BY JURY**

PLAINTIFFS SCELETIA EVANS, DERRICK BELL, YVETTE BURKE, BERNARDETTE HURTTE-REID, ERICA BROWN, ARIYANNA BROWN, SHANIYA FOSTER, DANIELLE LEE, BREONA SCOTT, FLIMEGRI MELANCON, JOHN GIBBS, and SHAWN MELANCON (“PLAINTIFFS”), hereby alleges and complaints through their attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC, as against DEFENDANTS LAWLER FOR CONGRESS, INC., THRESHOLD STRATEGIES, LLC, VICTORY FIELD OPERATIONS, LLC, VEN-VAMOS STRATEGIES, LLC, MOMENTUM X GROUP LLC, MIKE VINCENT LAWLER, ERIC RAMON DIAZ VASQUEZ, ANASTASIA YOPP AND NADIR A. PEREZ (“DEFENDANTS”) as follows:

## NATURE OF THE ACTION

1. PLAINTIFFS complain under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA"), 42 U.S.C. § 1981, the New York Labor Law §§ 190 et seq. and 650 et seq. ("NYLL"), the New York State Human Rights Law, Executive Law §§ 296 et seq. ("NYSHRL"), New York common law for unpaid minimum wages, unpaid overtime, recordkeeping violations (wage notice and wage statement violations), retaliation, discrimination (hostile work environment), breach of contract, unjust enrichment, and fraud.

2. DEFENDANT MIKE VINCENT LAWLER is an American Republican politician who represents New York's 17th Congressional District in the United States House of Representatives and is running for re-election to continue to serve as U.S. House of Representative for New York's 17th Congressional District in the November 2026 election.

3. DEFENDANT LAWLER FOR CONGRESS, INC. emphasized on its website that if DEFENDANT MIKE VINCENT LAWLER is re-elected, DEFENDANT MIKE VINCENT LAWLER would, allegedly, ***"protect coverage for New York's most vulnerable residents, including low-income individuals, seniors, and single-parent households."*** (https://www.lawlerforcongress.com/about/)

4. Further, the website states that DEFENDANT MIKE VINCENT LAWLER touts himself as being a ***"strong advocate for working families [and] seniors."*** (*Id*.)

5. However, behind the scenes, and outside of the view of the public where no one is watching, DEFENDANT MIKE VINCENT LAWLER promises prove to be lip service and DEFENDANT LAWLER demonstrated through his own actions and the actions of his agents, representatives, employees and staff that **he is ready, willing and able to take advantage of the most vulnerable members of the population as a means to justify his**

**re-election ends.** DEFENDANT MIKE VICENT LAWLER'S promises to stand up for working class families and seniors ring hollow when compared to his actual record, which PLAINTIFFS witnessed firsthand as will be described in detail below. **Indeed, once DEFENDANT MIKE VINCENT LAWLER, his agents, representatives and employee DEFENDANTS caused PLAINTIFFS to commit to work for his campaign, he immediately and repeatedly subjected them to abuse, humiliation, violations of labor laws, ridicule, unfair labor practices, broken promises and a host of other unsavory and unlawful conduct.**

6. In order to conduct voter-outreach operations on his behalf, DEFENDANT MIKE VINCENT LAWLER utilized DEFENDANTS LAWLER FOR CONGRESS, INC., THRESHOLD STRATEGIES, LLC, VICTORY FIELD OPERATIONS, LLC, VEN-VAMOS STRATEGIES, LLC, MOMENTUM X GROUP LLC, MIKE VINCENT LAWLER, ERIC RAMON DIAZ VASQUEZ, ANASTASIA YOPP AND NADIR A. PEREZ ("DEFENDANTS"), to recruit and employ PLAINTIFFS to work as political canvassers for DEFENDANT MIKE VINCENT LAWLER'S 2026 re-election campaign.

7. PLAINTIFFS are various members of the public with different life experiences, who all shared a common goal – to work as canvassers for DEFENDANTS in exchange for compensation that was clearly communicated and promised to them each.

8. To galvanize political canvassers in support of DEFENDANT MIKE VINCENT LAWLER'S 2026 re-election campaign, DEFENDANTS promised the PLAINTIFFS, non-New York residents, employment opportunities and benefits to work for DEFENDANT MIKE VINCENT LAWLER'S 2026 re-election campaign as well as assuring them that they would earn between $1,200 to $3,000 weekly, would be provided with housing, and

reimbursed for travel costs from their respective hometowns to New York State. DEFENDANT LAWLER FOR CONGRESS, INC.'S advertisement wherein it requested canvassers and made specific promises of compensation is displayed below:




9. In reliance on DEFENDANTS' [mis]representations and (false) promises of employment opportunities, compensation, and housing and travel costs covered, PLAINTIFFS accepted DEFENDANTS' offer of employment to work as political canvassers for DEFENDANT MIKE VINCENT LAWLER'S 2026 re-election campaign.

10. As such, PLAINTIFFS, non-New York residents who all faced financial hardship and needed employment, put faith in DEFENDANTS' promises and agreed to travel from six different

states to New York with the understanding that they would work as political canvassers for DEFENDANTS, get paid for all the hours they performed work as required by federal and New York law, be provided with housing throughout their employment and would be reimbursed for all the travel costs.

11. However, as soon as PLAINTIFFS arrived in New York to begin their employment as political canvassers for DEFENDANTS, DEFENDANTS' promises and assurances about pay, safe working conditions, housing, and travel reimbursement were *not* honored, blatantly changed, and callously implemented in reckless disregard for the concerns and safety of PLAINTIFFS. DEFENDANTS, in no uncertain terms, ran a "canvassers' sweat shop."

12. Indeed, these promises and assurances made to PLAINTIFFS during the recruitment process to secure their commitment to work on behalf of DEFENDANT MIKE VINCENT LAWLER as political canvassers were all lip service and ***made to deceive, exploit, and fraudulently induce*** the PLAINTIFFS to come to New York, start working for DEFENDANTS immediately, be paid unlawfully, and be discriminated and retaliated against throughout their employment.

13. For instance, as soon as they began their employment on behalf of DEFENDANT MIKE VINCENT LAWLER, DEFENDANTS informed the PLAINTIFFS they would not have a base salary and instead DEFENDANTS would pay them a flat rate of ***only*** $1 per door they canvass, which was not in alignment with the terms and conditions of employment agreed upon during the onboarding process and promised in DEFENDANTS' job posting.

14. As PLAINTIFFS had already traveled from their respective states **(Texas, Michigan, Georgia, South Carolina, and Maryland)** to work solely on behalf of DEFENDANT MIKE VINCENT LAWLER'S 2026 re-election campaign and could not afford to travel

back to their respective states, PLAINTIFFS were forced to continue their work for DEFENDANTS, with the expectation that the promises and assurances made by DEFENDANTS would eventually be fulfilled.

15. Once they began their employment in September 2026, the PLAINTIFFS worked approximately between seventy (70) and eighty-four (84) hours per week, but DEFENDANTS failed/refused to pay them the minimum wage under the FLSA and the New York Labor Laws.

16. DEFENDANTS also failed to pay the PLAINTIFFS overtime for each hour they worked over 40 hours per week, in violation of State and Federal employment laws.

**17. To make matters worse, DEFENDANTS also exposed PLAINTIFFS to a hostile work environment due to their race, age, religion and disability, which made their working conditions even more unbearable.**

18. For example, at the orientation session, the Director of DEFENDANT MOMENTUM X GROUP LLC, DEFENDANT ERIC RAMON DIAZ VASQUEZ told the PLAINTIFFS that their job was so easy that ***"even monkeys can do it."*** Later, DEFENDANT ERIC RAMON DIAZ VASQUEZ approached a table of Black canvassers and stated he feels ***"like he's surrounded by a group of monkeys."***

19. PLAINTIFFS SCOTT, BELL, GIBBS, HURTTE-REID, EVANS, BURKE, HOSEA MELANCON, and BROWN were extremely uncomfortable with DEFENDANT ERIC RAMON DIAZ VASQUEZ'S use of a ***deeply offensive racial slur*** which they knew was directed to all the Black/African American political canvassers like themselves.

20. Moreover, PLAINTIFFS BURKE and HURTTE-REID, the older women on the crew, were told they were part of **"*the geriatric crew*,"** and PLAINTIFF BURKE was told she was **"*too***

***old, too fat, and unhealthy*"** to continue to canvass for DEFENDANTS.

21. PLAINTIFFS BURKE and HURTTE-REID are also Muslim and were outrageously and repeatedly called **"*the ladies with the head wraps*,"** referring to their Hijabs, which they wear for religious reasons.

22. Further, when PLAINTIFF HURTTE-REID disclosed her physical disabilities, DEFENDANTS refused to accommodate her, despite her need for accommodations. And when PLAINTIFF LEE disclosed her disability (severe dog allergy), DEFENDANTS called her ***"a problem"*** and ***terminated her immediately*** after requesting reasonable accommodations.

23. To add insult to injury, on September 11, 2026, DEFENDANTS *refused* to pay the PLAINTIFFS *any compensation* for the work they performed for that workweek on behalf of DEFENDANTS.

24. Having not been paid any compensation for work performed on behalf of DEFENDANTS, PLAINTIFFS immediately engaged in protected activity and complained directly to DEFENDANT ERIC RAMON DIAZ VASQUEZ about DEFENDANTS' failure to pay them the minimum wage, overtime wages, exposing them to unsafe living conditions, and DEFENDANTS' relentless discrimination and retaliation against PLAINTIFFS.

25. Immediately after raising complaints about DEFENDANTS' unlawful conduct, a couple of hours later, DEFENDANT ERIC RAMON DIAZ VAZQUEZ callously and wrongfully terminated the PLAINTIFFS, stating, among other things, "***guess what, you all [are] fired."***

26. As a final blow to PLAINTIFFS, once PLAINTIFFS (through their counsel) privately informed DEFENDANTS of the claims in this Complaint, within less than one day thereafter, at least one PLAINTIFF began to receive threats against thier safety (including

an alleged death threat against PLAINTIFF and PLAINTIFFF'S child). Thus, what was once a wage and hour violation and discrimination case has now escalated into a physically threatening and dangerous situation for PLAINTIFF(S) – all because they simply wanted to get paid what they worked for, and what was promised for that work, by DEFENDANTS.

27. PLAINTIFFS assert that DEFENDANTS ***discriminated and retaliated*** against them solely due to their race, religion, disability, age, and their engagement in protected activities and failed to pay them lawfully in violation of the NYSHRL, the FLSA, the NYLL, and New York common law, as described below.

## JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, and 1343 and has jurisdiction over PLAINTIFFS' FLSA claims under 29 U.S.C. § 201 et seq.

29. This Court has supplemental jurisdiction over PLAINTIFFS' state law claims under 28 U.S.C. § 1367. The Court also has jurisdiction over PLAINTIFFS' claims under the NYS Human Rights Law as the discriminatory and retaliatory conduct alleged herein impacted PLAINTIFFS in New York State.

30. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the action occurred in this District.

31. Several PLAINTIFFS have claims for employment discrimination under federal laws, including but not limited to Title VII, the ADA and ADEA. These PLAINTIFFS will file Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") for their investigation and information, and then the Parties will move to amend this Complaint upon conclusion of same in accordance with these laws.

## THE PARTIES

**PLAINTIFFS:**

41. **PLAINTIFF SCELETIA EVANS ("EVANS")** was, at all relevant times, an adult individual residing in Texas.

42. Evans was employed by DEFENDANTS from on or about September 3, 2026 through on or about September 11, 2026 (the "Evans Employment Period") as a political canvasser in Westchester County, New York.

43. Throughout the Evans Employment Period, Evans typically worked seven (7) days per week, approximately ten (10) to twelve (12) hours per day, from approximately 8:00 a.m. until after 8:00 p.m., for approximately seventy (70) to eighty-four (84) hours per week.

44. Throughout the Evans Employment Period, DEFENDANTS failed to pay Evans the minimum wage for all the hours she worked.

45. DEFENDANTS also failed to pay Evans overtime premium pay (1.5 times) for each hour she worked over 40 hours worked per week.

46. To date, DEFENDANTS have not paid Evans any compensation for the work performed for DEFENDANTS.

47. **PLAINTIFF DERRICK BELL ("BELL")** was, at all relevant times, an adult individual residing in Georgia.

48. Bell was employed by DEFENDANTS from on or about September 3, 2026 through on or about September 11, 2026 (the "Bell Employment Period") as a political canvasser in Westchester County, New York.

49. Throughout the Bell Employment Period, Bell typically worked seven (7) days per week, approximately ten (10) to twelve (12) hours per day, for approximately seventy (70) to

eighty-four (84) hours per week, from approximately 8:00 a.m. until after 8:00 p.m.

50. Bell received payments of $91.00 on September 11, 2026 and $536.00 on September 18, 2026, totaling $627.00, an effective hourly rate of approximately $7.46 to $8.96.

51. At this rate, DEFENDANTS failed to pay Bell the minimum wage for all the hours she worked.

52. DEFENDANTS also failed to pay Bell overtime premium pay (1.5 times) for each hour she worked over 40 hours worked per week.

53. **PLAINTIFF YVETTE BURKE (“BURKE”)** was, at all relevant times, an adult individual residing in Georgia.

54. Burke was employed by DEFENDANTS from on or about September 3, 2026 through on or about September 11, 2026 (the “Burke Employment Period”) as a political canvasser in Westchester County, New York.

55. Throughout the Burke Employment Period, Burke typically worked seven (7) days per week, approximately ten (10) to twelve (12) hours per day, for approximately seventy (70) to eighty-four (84) hours per week, from approximately 8:00 a.m. until after 8:00 p.m.

56. Burke received deposits on September 11, 2026 and September 18, 2026, but his compensation was still below the minimum wage.

57. As such, DEFENDANTS failed to pay Burke the minimum wage for all the hours she worked.

58. DEFENDANTS also failed to pay Burke overtime premium pay (1.5 times) for each hour she worked over 40 hours worked per week.

59. **PLAINTIFF BERNARDETTE HURTTE-REID (“HURTTE-REID”)** was, at all relevant times, an adult individual residing in Georgia.

60. Hurtte-Reid was employed by DEFENDANTS from on or about September 3, 2026 through on or about September 11, 2026 (the "Hurtte-Reid Employment Period") as a political canvasser in Westchester County, New York.

61. Throughout the Hurtte-Reid Employment Period, Hurtte-Reid typically worked seven (7) days per week, approximately ten (10) to twelve (12) hours per day, for approximately seventy (70) to eighty-four (84) hours per week, from approximately 8:00 a.m. until after 8:00 p.m.

62. Hurtte-Reid received payments of $31.00 on September 11, 2026 and $244.00 on September 18, 2026, totaling $275.00, an effective hourly rate of approximately $3.27 to $3.93.

63. At this rate, DEFENDANTS failed to pay Hurtte-Reid the minimum wage for all the hours she worked.

64. DEFENDANTS also failed to pay Hurtte-Reid overtime premium pay (1.5 times) for each hour she worked over 40 hours worked per week.

65. **PLAINTIFF ERICA BROWN ("E. BROWN")** was, at all relevant times, an adult individual residing in Maryland.

66. E. Brown was employed by DEFENDANTS from on or about September 2, 2026 through on or about September 11, 2026 (the "E. Brown Employment Period") as a political canvasser in Westchester County, New York.

67. Throughout the E. Brown Employment Period, E. Brown typically worked seven (7) days per week, approximately ten (10) to twelve (12) hours per day, for approximately seventy (70) to eighty-four (84) hours per week, from approximately 8:00 a.m. until after 8:00 p.m.

68. E. Brown received payments of approximately $40.00 on September 11, 2026 and $650.00 on September 18, 2026, totaling $690.00, an effective hourly rate of approximately $8.21 to

$9.86.

69. At this rate, DEFENDANTS failed to pay E. Brown the minimum wage for all the hours she worked.

70. DEFENDANTS also failed to pay E. Brown overtime premium pay (1.5 times) for each hour she worked over 40 hours worked per week.

71. **PLAINTIFF ARIYANNA BROWN ("A. BROWN")** was, at all relevant times, an adult individual residing in Maryland.

72. A. Brown was employed by DEFENDANTS from on or about September 2, 2026 through on or about September 11, 2026 (the "A. Brown Employment Period") as a political canvasser in Westchester County, New York.

73. Throughout the A. Brown Employment Period, A. Brown typically worked seven (7) days per week, approximately ten (10) to twelve (12) hours per day, for approximately seventy (70) to eighty-four (84) hours per week, from approximately 8:00 a.m. until after 8:00 p.m.

74. A. Brown received payments of $175.00 on September 11, 2026 and a second payment on September 18, 2026, but her compensation was still below the minimum wage.

75. As such, DEFENDANTS failed to pay A. Brown the minimum wage for all the hours she worked.

76. DEFENDANTS also failed to pay A. Brown overtime premium pay (1.5 times) for each hour she worked over 40 hours worked per week.

77. **PLAINTIFF SHANIYA FOSTER ("FOSTER")** was, at all relevant times, an adult individual residing in Maryland.

78. Foster was employed by DEFENDANTS from on or about September 2, 2026 through on or about September 11, 2026 (the "Foster Employment Period") as a political canvasser in

Westchester County, New York.

79. Throughout the Foster Employment Period, Foster typically worked seven (7) days per week, approximately ten (10) to twelve (12) hours per day, for approximately seventy (70) to eighty-four (84) hours per week, from approximately 8:00 a.m. until after 8:00 p.m.

80. Foster received payments of $365.00 on September 11, 2026 and a second payment on September 18, 2026, but her compensation was still below the minimum wage.

81. At this rate, DEFENDANTS failed to pay Foster the minimum wage for all the hours she worked.

82. DEFENDANTS also failed to pay Foster overtime premium pay (1.5 times) for each hour she worked over 40 hours worked per week.

83. **PLAINTIFF DANIELLE LEE ("LEE")** was, at all relevant times, an adult individual residing in Michigan.

84. Lee was employed by DEFENDANTS from on or about September 2, 2026 through on or about September 8, 2026 (the "Lee Employment Period") as a political canvasser in Westchester County, New York.

85. Throughout the Lee Employment Period, Lee typically worked approximately ten (10) to twelve (12) hours per day, for about five (5) days, for approximately fifty (50) to sixty (60) hours per week, from approximately 8:00 a.m. until after 8:00 p.m.

86. Lee only received one payment of $200.00 on September 18, 2026, at an effective hourly rate of $4.00 to $3.33 per hour.

87. At this rate, DEFENDANTS failed to pay Lee the minimum wage for all the hours she worked.

88. DEFENDANTS also failed to pay Lee overtime premium pay (1.5 times) for each hour she

worked over 40 hours worked per week.

89. **PLAINTIFF BREONA SCOTT ("SCOTT")** was, at all relevant times, an adult individual residing in Texas.

90. Scott was employed by DEFENDANTS from on or about September 3, 2026 through on or about September 11, 2026 (the "Scott Employment Period") as a canvasser in Westchester County, New York.

91. Throughout the Scott Employment Period, Scott typically worked seven (7) days per week, approximately ten (10) to twelve (12) hours per day, for approximately seventy (70) to eighty-four (84) hours per week, from approximately 8:00 a.m. until after 8:00 p.m.

92. Scott received payments of $100.00 on September 11, 2026 and $512.00 on September 18, 2026, totaling $612.00, an effective hourly rate of approximately $7.29 to $8.74.

93. At this rate, DEFENDANTS failed to pay Scott the minimum wage for all the hours she worked.

94. DEFENDANTS also failed to pay Scott overtime premium pay (1.5 times) for each hour she worked over 40 hours worked per week.

95. **PLAINTIFF FLIMEGRI MELANCON ("F. MELANCON")** was, at all relevant times, an adult individual residing in Texas.

96. F. Melancon was employed by DEFENDANTS from on or about September 3, 2026 through on or about September 11, 2026 (the "F. Melancon Employment Period") as a canvasser in Westchester County, New York.

97. Throughout the F. Melancon Employment Period, F. Melancon typically worked seven (7) days per week, approximately ten (10) to twelve (12) hours per day, for approximately seventy (70) to eighty-four (84) hours per week, from approximately 8:00 a.m. until after

8:00 p.m.

98. F. Melancon received payments of $92.00 on September 18, 2026 and $346.00 on September 25, 2026, totaling $438.00, an effective hourly rate of approximately $5.21 to $6.26.

99. At this rate, DEFENDANTS failed to pay F. Melancon the minimum wage for all the hours she worked.

100. DEFENDANTS also failed to pay F. Melancon overtime premium pay (1.5 times) for each hour she worked over 40 hours worked per week.

101. **PLAINTIFF JOHN GIBBS ("GIBBS")** was, at all relevant times, an adult individual residing in South Carolina.

102. Gibbs was employed by DEFENDANTS from on or about September 3, 2026 through on or about September 11, 2026 (the "Gibbs Employment Period") as a driver and door knocker in Westchester County, New York.

103. Throughout the Gibbs Employment Period, Gibbs typically worked seven (7) days per week, approximately ten (10) to twelve (12) hours per day, from approximately 8:00 a.m. until after 8:00 p.m., for approximately seventy (70) to eighty-four (84) hours per week.

104. Gibbs received payments of $20.00 on September 11, 2026 and a second payment on September 18, 2026, but his pay was still below the minimum wage.

105. At this rate, DEFENDANTS failed to pay Gibbs the minimum wage for all the hours he worked.

106. DEFENDANTS also failed to pay Gibbs overtime premium pay (1.5 times) for each hour he worked over 40 hours worked per week.

107. **PLAINTIFF SHAWN MELANCON ("S. MELANCON")** was, at all relevant times, an adult individual residing in Texas.

108. S. Melancon was employed by DEFENDANTS from on or about September 3, 2026 through on or about September 11, 2026 (the "S. Melancon Employment Period") as a canvasser in Westchester County, New York.

109. Throughout the S. Melancon Employment Period, S. Melancon typically worked seven (7) days per week, approximately ten (10) to twelve (12) hours per day, for approximately seventy (70) to eighty-four (84) hours per week, from approximately 8:00 a.m. until after 8:00 p.m.

110. S. Melancon received payments of $90.00 on September 11, 2026 and $442.00 on September 18, 2026, totaling $532.00, an effective hourly rate of approximately $6.33 to $7.60.

111. At this rate, DEFENDANTS failed to pay S. Melancon the minimum wage for all the hours she worked.

112. DEFENDANTS also failed to pay S. Melancon overtime premium pay (1.5 times) for each hour she worked over 40 hours worked per week.

**<u>DEFENDANTS</u>:**

113. **DEFENDANT LAWLER FOR CONGRESS, INC. ("DEFENDANT LAWLER CAMPAIGN")** is a political campaign organization established to support the re-election of DEFENDANT MICHAEL VINCENT LAWLER to the United States House of Representatives, representing New York's 17th Congressional District in the 2026 election.

114. DEFENDANT LAWLER CAMPAIGN is located at 18 Maple Ave, Back Door New City, New York 10956.

115. DEFENDANT LAWLER CAMPAIGN contracted DEFENDANT THRESHOLD to hire PLAINTIFFS to work on DEFENDANT MIKE VINCENT LAWLER'S 2026 re-election campaign.

116. **DEFENDANT MIKE VINCENT LAWLER ("DEFENDANT LAWLER")** is a Republican politician who represents New York's 17th Congressional District in the United States House of Representatives since January 2023. At all relevant times, DEFENDANT LAWLER exercised operational control over DEFENDANT LAWLER CAMPAIGN.

117. DEFENDANT LAWLER, through his political campaign organization, DEFENDANT LAWLER CAMPAIGN, contracted with third-party companies to recruit and employ political canvassers, including PLAINTIFFS, to perform political canvassing and other campaign activities in support of DEFENDANT LAWLER'S 2026 re-election campaign for the United States House of Representatives.

118. Accordingly, DEFENDANT LAWLER had the ability to affect the terms and conditions of PLAINTIFFS' employment, including hiring, compensation, and firing. DEFENDANT LAWLER is being sued herein in his individual capacity.

119. **DEFENDANT THRESHOLD STRATEGIES, LLC ("DEFENDANT THRESHOLD")** is a limited liability company that operates in political consulting and campaign field operations. DEFENDANT THRESHOLD is located at 6175 Hickory Flat Hwy, Ste 110-401, Canton, Georgia 30115 and upon information and belief, is authorized to do business in the State of New York.

120. Upon information and belief, DEFENDANT THRESHOLD was contracted by DEFENDANTS LAWLER CAMPAIGN and DEFENDANT LAWLER to recruit and employ political canvassers, including PLAINTIFFS, to perform political canvassing and other campaign activities in support of DEFENDANT LAWLER'S 2026 re-election campaign for the United States House of Representatives.

121. Subsequently, DEFENDANT THRESHOLD subcontracted DEFENDANT VICTORY

FIELD OPERATIONS, LLC to oversee the PLAINTIFFS' employment as political canvassers on behalf of DEFENDANTS.

122. **DEFENDANT VICTORY FIELD OPERATIONS, LLC ("DEFENDANT VFO")** is a political field-operations company that provides canvassing and other services to political companies and is located at 620 N Kane Rd, Webberville, Michigan 48892. Upon information and belief, DEFENDANT VFO is a foreign business entity that is authorized to do business in the State of New York.

123. Upon information and belief, DEFENDANT VFO was subcontracted by DEFENDANT THRESHOLD to recruit and employ political canvassers, including PLAINTIFFS, to work on DEFENDANT MIKE LAWLER'S 2026 re-election campaign. Subsequently, DEFENDANT VFO subcontracted DEFENDANT VEN-VAMOS.

124. DEFENDANT VFO was directly involved in the onboarding process of PLAINTIFFS.

125. At all relevant times, DEFENDANT VFO made payments to PLAINTIFFS through Cash App and/or direct deposit throughout their employment at DEFENDANTS.

126. **DEFENDANT VEN-VAMOS STRATEGIES, LLC ("DEFENDANT VEN-VAMOS")** is a private political consulting and campaign-staffing company that is located at 6801 NW 77th Ave, Suite 203, Miami, Florida 33166. Upon information and belief, DEFENDANT VEN-VAMOS is a foreign business company that is authorized to do business in the State of New York.

127. Upon information and belief, DEFENDANT VEN-VAMOS was subcontracted by DEFENDANT VFO to recruit and employ political canvassers, including PLAINTIFFS, to perform political canvassing and other campaign activities in support of DEFENDANT LAWLER'S 2026 re-election campaign for the United States House of Representatives.

128. Subsequently, DEFENDANT VEN-VAMOS subcontracted DEFENDANT MOMENTUM.

129. **DEFENDANT NADIR A. PEREZ ("DEFENDANT PEREZ")** is the Founder/CEO of DEFENDANT Ven-Vamos. As Founder/CEO, DEFENDANT PEREZ was/is the head decision maker at/of DEFENDANT VEN-VAMOS and had the ability to affect the terms and conditions of PLAINTIFFS' employment, including hiring and firing.

130. **DEFENDANT MOMENTUM X GROUP LLC ("DEFENDANT MOMENTUM")** is a political canvassing and campaign-staffing company. DEFENDANT MOMENTUM is located at 7520 NW 104TH Ave A1031221, Doral, Florida 33178 and, upon information and belief, DEFENDANT MOMENTUM is a foreign business company that is authorized to do business in the State of New York.

131. Upon information and belief, DEFENDANT MOMENTUM was subcontracted by DEFENDANT VEN-VAMOS to recruit and employ political canvassers, including PLAINTIFFS, to perform political canvassing and other campaign activities in support of DEFENDANT MIKE LAWLER'S 2026 re-election campaign.

132. DEFENDANT MOMENTUM recruited, trained, supervised, and assigned work to PLAINTIFFS to perform political canvassing in Westchester County on behalf of DEFENDANT LAWLER.

133. **DEFENDANT ERIC RAMON DIAZ VASQUEZ "DEFENDANT DIAZ")** is the Owner/Director of Momentum X Group LLC. As Owner/Director, DEFENDANT DIAZ is the head decision maker at DEFENDANT MOMENTUM and had the ability to affect the terms and conditions of PLAINTIFFS' employment, including hiring and firing, and was directly involved in the unlawful conduct alleged herein. DEFENDANT DIAZ is being sued herein in his individual capacity. At all relevant times, DEFENDANT DIAZ had knowledge

of DEFENDANTS' failure to pay the PLAINTIFFS the minimum wage and overtime, and directly participated in the discriminatory and retaliatory hostile work environment the PLAINTIFFS were subjected to on account of their disability, age, race, and religion and their engagement in protected activities. DEFENDANT DIAZ is being sued herein in his individual capacity.

134. **DEFENDANT ANASTASIA YOPP ("DEFENDANT YOPP").** DEFENDANT YOPP recruited PLAINTIFFS to work for DEFENDANTS and was directly involved in the onboarding process of PLAINTIFFS. DEFENDANT YOPP exercised managerial work over PLAINTIFFS, including by assigning duties to PLAINTIFFS and leading pre- and post-shift meetings. DEFENDANT YOPP had the ability to affect the terms and conditions of PLAINTIFFS' employment, including hiring and firing, and was directly involved in the unlawful conduct alleged herein. DEFENDANT YOPP is being sued herein in her individual capacity.

135. **CORPORATE DEFENDANTS LAWLER FOR CONGRESS, INC., THRESHOLD STRATEGIES, LLC, VICTORY FIELD OPERATIONS, LLC, VEN-VAMOS STRATEGIES, LLC, MOMENTUM X GROUP LLC, and INDIVIDUAL DEFENDANTS MIKE VINCENT LAWLER, ERIC RAMON DIAZ VASQUEZ, ANASTASIA YOPP, and NADIR A. PEREZ will be collectively referred to as "DEFENDANTS" and were "Joint Employers" over PLAINTIFFS at all times relevant to the Complaint.**

136. Throughout the relevant time period, DEFENDANTS jointly employed PLAINTIFFS.

137. Upon information and belief, DEFENDANT LAWLER CAMPAIGN and DEFENDANT LAWLER subcontracted DEFENDANTS to recruit, train, supervise, and assign work to

PLAINTIFFS to perform political canvassing in Westchester County on behalf of DEFENDANT MIKE LAWLER.

138. Upon information and belief, DEFENDANTS operated as a single integrated enterprise and/or as joint employers in providing political canvassing labor for DEFENDANT MIKE LAWLER'S 2026 re-election campaign.

139. The INDIVIDUAL DEFENDANTS participated in the day-to-day operations of the CORPORATE DEFENDANTS and acted intentionally in their direction and control of PLAINTIFFS.

140. The INDIVIDUAL DEFENDANTS are "employers" under the FLSA, 29 U.S.C. § 203(d), and 29 C.F.R. § 791.2, as well as NYLL § 2 and the regulations thereunder. As such, they are jointly and severally liable with the CORPORATE DEFENDANTS.

141. At all relevant times, DEFENDANTS have been employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

142. At all relevant times, PLAINTIFFS were employed by DEFENDANTS within the meaning of NYLL §§ 2 and 651.

## MATERIAL FACTS

### Defendants' Recruitment and Hiring of Plaintiffs

143. PLAINTIFFS were recruited to work as political canvassers in the New York metropolitan area, performing canvassing and other campaign activities in support of DEFENDANT LAWLER'S 2026 re-election campaign for the United States House of Representatives, representing New York's 17th Congressional District.

144. DEFENDANTS, through their agent, DEFENDANT YOPP, contacted PLAINTIFFS to

work as a political canvasser in support of DEFENDANT LAWLER'S 2026 re-election campaign.

145. DEFENDANT YOPP and DEFENDANT VFO directly participated in the onboarding and recruitment process of PLAINTIFFS.

146. As such, PLAINTIFFS were required to complete a form directly on the DEFENDANT VFO's website.

147. DEFENDANT YOPP communicated to PLAINTIFFS that the political canvasser position guaranteed compensation between $1,200 to $3,000 per week, provided them with housing, and covered travel, from the beginning of September 2026 through Election Day, November 3, 2026.

148. Indeed, DEFENDANTS' recruitment flyer promised PLAINTIFFS the following conditions of employment: ***"$2 A DOOR,"*** ***"MAKE $1,500 - $3,000 WEEKLY BASE PAY + BONUSES,"*** ***"HOUSING COVERED WE TAKE CARE OF YOUR STAY,"*** and ***"TRAVEL COVERED GET TO NEW YORK ON US."***

149. In reasonable reliance on DEFENDANTS' assurances about pay, housing, lodging, and other terms of employment presented to them, PLAINTIFFS accepted the positions offered by DEFENDANTS.

150. PLAINTIFFS were unaware that DEFENDANTS intended to recruit vulnerable people from out of state, far from New York, to work in New York, to entrap the canvassers in a scheme to force them to work for fractions of what they were promised.

151. Upon information and belief, pursuant to DEFENDANTS' scheme, once PLAINTIFFS committed to the job and travelled all the way to New York, DEFENDANTS knew that it would be extremely difficult or inconvenient for those canvassers to resist continuing to work

once the terms and conditions of the job were altered.

152. DEFENDANTS intended to bait the canvassers to accept a position, which would then be switched (*i.e.* bait and switch") when it was too late for them to object or complain.

153. On September 1, 2026, PLAINTIFFS who each resided outside of the State of New York traveled from their respective home states, including but not limited to Texas, Georgia, South Carolina, Maryland, and Michigan, to New York to work as political canvassers for DEFENDANT LAWLER's 2026 re-election campaign.

154. As such, PLAINTIFFS rented vehicles and took flights to New York in reliance upon promises that same would be reimbursed by DEFENDANTS.

155. On September 2, 2026, the first group of PLAINTIFFS arrived in New York.

156. On that day, PLAINTIFFS were required to complete tasks before the rest of the group arrived, including organizing campaign merchandise such as T-shirts and hats and preparing baskets of water and snacks.

157. At all relevant times, PLAINTIFFS were not compensated for all the hours they worked completing tasks such as organizing campaign merchandise and preparing baskets of water and snacks.

158. DEFENDANTS then provided lodging in Yonkers, New York, for PLAINTIFFS.

159. On September 3, 2026, PLAINTIFFS began their first day of employment.

160. The Director of DEFENDANT MOMENTUM, DEFENDANT DIAZ, and the manager Federico Guillermo Almenar Garcia ("Mr. Garcia") held an orientation session for PLAINTIFFS.

161. DEFENDANTS instructed PLAINTIFFS to perform political canvassing activities in a designated territory, including but not limited to Westchester County.

162. Specifically, DEFENDANTS instructed PLAINTIFFS to conduct a survey at each residence, asking residents which candidate they intended to vote for and, if they did not intend to vote for DEFENDANT LAWLER, the reasons for their opposition.

163. PLAINTIFFS were given specific instructions with regard to how to conduct themselves as canvassers out in the field. PLAINTIFFS could not make their own independent decision about how to canvass areas. They were each compelled to follow the instructions of DEFENDANTS.

164. DEFENDANTS provided PLAINTIFFS with pamphlets, a hat, a shirt, and a campaign badge displaying DEFENDANT LAWLER'S face.

165. PLAINTIFFS were given a program ("app") to guide their job duties.

166. Specifically, PLAINTIFFS were instructed to use the "Walk-Book application" to view their assigned routes and confirm each residence they canvassed.

**Defendants' Unlawful Conduct Towards Plaintiffs**

**A. Race, Religion and Age Discrimination**

167. During the orientation session, DEFENDANT DIAZ grossly asked, ***"Do you know the difference between an asshole and a penis?"*** and later stated PLAINTIFFS' position was so easy that ***"even monkeys can do it."***

168. PLAINTIFFS were shocked by DEFENDANT DIAZ'S remarks, which they understood to be racially discriminatory as they were all minorities.

169. DEFENDANT DIAZ knew or should have known that his language, on behalf of DEFENDANT LAWLER'S campaign, was inappropriate, racially derogatory, and offensive.

170. DEFENDANT DIAZ ignored his knowledge that he was engaging in offensive

conduct/speech because DEFENDANT DIAZ simply did not care. PLAINTIFFS were expendable and not worthy of respect from the outset.

171. DEFENDANT DIAZ then informed PLAINTIFFS of the bait and switch, which was that DEFENDANTS would not pay them on a salary basis as originally promised.

172. DEFENDANT DIAZ then acknowledged that DEFENDANTS misrepresented the promised compensation and explained that DEFENDANTS would instead compensate PLAINTIFFS at a rate of $1 per door canvassed.

173. This compensation was materially different than the compensation originally promised to PLAINTIFFS and substantially altered the terms and conditions of PLAINTIFFS' employment.

174. Then, to add insult to injury, DEFENDANT DIAZ informed PLAINTIFFS that they were required to canvass *at least 100 doors* per day to *retain* their housing accommodations and that they ***would not*** be reimbursed for transportation, meaning the rental cars and flights taken from their home states to arrive in New York.

175. Here too, PLAINTIFFS were shocked as DEFENDANTS repeatedly assured and promised PLAINTIFFS that their travel to New York would be covered.

176. Again, DEFENDANTS materially altered the promised terms and conditions of PLAINTIFFS' employment to the detriment of PLAINTIFFS.

177. Further, DEFENDANTS did not mention that their housing accommodations would be contingent on them completing at least 100 doors per day.

178. This was another material change in promises originally offered to PLAINTIFFS that altered the terms and conditions of employment, as PLAINTIFFS were informed that, after travelling across the country to work for DEFENDANTS, their lodging would be contingent

up on visiting at least 100 doors a day, which was a herculean feet per person.

179. PLAINTIFFS were disappointed to learn of the change in their compensation and working conditions and that DEFENDANTS would not reimburse them for the travel expenses as initially promised.

180. This meant that PLAINTIFFS were now paying to work for DEFENDANTS and/or would be working at a loss.

181. DEFENDANTS could have hired canvassers locally, who did not have lodging concerns, but intentionally targeted people from across the country to make it difficult to resist DEFENDANTS' fraudulent bait and switch. Once they arrived in New York to work, they would be trapped in New York and would need to continue to work.

182. DEFENDANTS' scheme worked perfectly on PLAINTIFFS, as if DEFENDANTS successfully did this before and calculated the outcome.

183. At that moment, PLAINTIFFS knew that DEFENDANTS had intentionally misrepresented the conditions and terms of their employment for the sole purpose of inducing them to come to New York, at their own expense, to work for DEFENDANTS.

184. However, given that PLAINTIFFS had already traveled to New York, at their expense, to work for DEFENDANTS, PLAINTIFFS had no choice but to remain in New York and start performing their assigned duties.

185. At the end of the orientation session, DEFENDANT DIAZ approached the table where PLAINTIFFS SCOTT, BELL, GIBBS, HURTTE-REID, EVANS, BURKE, H. MELANCON, and E. BROWN were seated.

186. PLAINTIFFS SCOTT, BELL, GIBBS, HURTTE-REID, EVANS, BURKE, H. MELANCON, and E. BROWN are Black/African American individuals.

187. DEFENDANT DIAZ sat at the table and stated that he felt, ***"like he's surrounded by a group of monkeys."*** As he said it, he held his hand to his chest as though shocked by who was seated there.

188. PLAINTIFFS SCOTT, BELL, GIBBS, HURTTE-REID, EVANS, BURKE, HOSEA MELANCON, and BROWN were extremely uncomfortable with DEFENDANT DIAZ'S use of a ***deeply offensive racial slur*** in their presence which they knew were directed to all the Black/African American political canvassers like themselves.

189. It was clear that DEFENDANT DIAZ'S remarks were directed at PLAINTIFFS SCOTT, BELL, GIBBS, HURTTE-REID, EVANS, BURKE, H. MELANCON, and E. BROWN'S race.

190. As such, PLAINTIFFS SCOTT, BELL, GIBBS, HURTTE-REID, EVANS, BURKE, H. MELANCON, and E. BROWN found the remark deeply offensive and racially insulting.

191. DEFENDANT DIAZ knew or should have known that his remarks were creating a hostile work environment for PLAINTIFFS.

192. DEFENDANTS' discriminatory treatment extended to other PLAINTIFFS as well.

193. For instance, PLAINTIFFS BURKE and HURTTE-REID are at least 60 years old.

194. DEFENDANT YOPP routinely chastised PLAINTIFFS BURKE and HURTTE-REID and stated that PLAINTIFFS BURKE and HURTTE-REID could not keep up due to their ages while outrageously referring to them as **"*the geriatric crew.*"**

195. At all relevant times, "geriatric" relates to other adults and is often used as an insult to imply someone is too old, out of touch, slow, or unable to keep up with younger people.

196. DEFENDANT YOPP would state, among other things, ***"You move too slow. You're too big"*** *and* ***"Why don't you bring the geriatric team here?"***

197. When DEFENDANT YOPP referred PLAINTIFFS BURKE and HURTTE-REID as ***"the geriatric crew,"*** he was referring to their *age* and insinuating that they are too old to work as political canvassers on behalf of DEFENDANT LAWLER.

198. At all relevant times, DEFENDANT YOPP only called PLAINTIFFS BURKE and HURTTE-REID *"the geriatric crew"* and treated then "less well" than their similarly situated younger counterparts due to their age(s).

199. DEFENDANT YOPP did not call PLAINTIFFS BURKE and HURTTE-REID'S similarly situated younger coworkers ***"the geriatric crew."***

200. At all relevant times, DEFENDANT YOPP'S remarks were directed at PLAINTIFFS BURKE'S and HURTTE-REID'S age.

201. Shortly thereafter, PLAINTIFF were told that DEFENDANTS had other employment opportunities in Tampa, Florida.

202. However, as soon as they inquired about the work opportunities in Tampa, Florida, PLAINTIFFS BURKE and HURTTE-REID were told they did *not* meet the criteria to go to Tampa.

203. When asked why they were ineligible for the employment opportunities in Tampa, Florida, DEFENDANT YOPP told PLAINTIFF BURKE that she was ***"too old, too fat, and unhealthy."***

204. PLAINTIFFS BURKE and HURTTE-REID were shocked to learn that DEFENDANTS refused to consider them for further work opportunities in Tampa, Florida solely due to their ages, perceived weights, and perceived health.

205. To make matters worse, DEFENDANTS also began discriminating against PLAINTIFFS BURKE and HURTTE-REID due to their religious beliefs.

206. PLAINTIFFS BURKE and HURTTE-REID are Muslim.

207. Due to their religious beliefs, PLAINTIFFS BURKE and HURTTE-REID wore hijabs, which is a head covering worn by many Muslim women for religious reasons.

208. At all relevant times, DEFENDANTS referred to PLAINTIFFS BURKE and HURTTE-REID as, ***"the ladies with the head wraps."***

209. DEFENDANTS' comments were highly offensive and inappropriate and made to further humiliate and mock PLAINTIFFS BURKE and HURTTE-REID solely due to their religious beliefs and practices.

210. At all relevant times, DEFENDANTS' conduct was unwelcome and created a hostile work environment for PLAINTIFFS BURKE and HURTTE-REID.

211. DEFENDANTS' remarks that pertained to PLAINTIFFS BURKE and HURTTE-REID'S religion were so hurtful and offensive that PLAINTIFFS BURKE and HURTTE-REID began to fear for their physical safety as it was clear that DEFENDANTS had some kind of discriminatory bias against them solely due to their religion beliefs and practices.

**B. Disability Discrimination and Failure to Accommodate**

212. DEFENDANTS also discriminated against other PLAINTIFFS due to their disabilities, whether actual and/or perceived.

213. For instance, the canvasser position required walking long distances and standing for extended periods, sometimes, in unpleasant weather.

214. Due to PLAINTIFF'S health conditions/disabilities, PLAINTIFF HURTTE-REID asked DEFENDANT DIAZ whether she could sit for short periods of time while working in the field.

215. To be clear, PLAINTIFF HURTTE-REID was able to perform the essential duties and

responsibilities of her position as a canvasser despite her health conditions/disabilities.

216. At this moment, PLAINTIFF HURTTE-REID was requesting a reasonable accommodation solely due to her health conditions/disabilities, primarily being able to sit for short periods of time while working in the field.

217. In response, DEFENDANT DIAZ outright stated that they would not accommodate her and that she had to continue performing the job like the rest of PLAINTIFFS.

218. DEFENDANT DIAZ made this summary decision to deny PLAINTIFF'S HURTTE-REID'S request for accommodations without any interactive process or cooperate dialogue whatsoever.

219. PLAINTIFF HURTTE-REID was shocked that DEFENDANT DIAZ refused to grant her accommodation or even offered an explanation why DEFENDANTS could not accommodate her.

220. As a result, PLAINTIFF HURTTE-REID was forced to continue to walk long distances and stand for extended periods, resulting in her hurting her foot while performing work as a canvasser.

221. At all relevant times, PLAINTIFF HURTTE-REID'S request(s) would have caused no undue hardship on DEFENDANTS.

222. After the injury, PLAINTIFF HURTTE-REID informed DEFENDANT DIAZ of the incident.

223. At all relevant times, DEFENDANTS did not provide any type of reasonable accommodations to PLAINTIFF HURTTE-REID, nor did they inform PLAINTIFF HURTTE-REID of her rights under the Workers Compensation Law(s) for an on-the-job injury.

224. DEFENDANTS further failed to engage in an interactive process as required by the laws.

225. DEFENDANTS also refused to accommodate PLAINTIFF LEE'S disability and retaliated against her as soon as she engaged in protected activity and requested reasonable accommodations.

226. At all relevant times, PLAINTIFF LEE suffered from a disability, whether actual and/or perceived. Specifically, PLAINTIFF has severe allergies to pets, especially dogs.

227. PLAINTIFF LEE learned that she would be assigned to a hotel room with co-worker, Jonathon Lockhart, was bringing a dog. PLAINTIFF was told that she would have to share and stay in the room with Jonathan and his dog for the duration of her employment.

228. PLAINTIFF immediately informed DEFENDANTS DIAZ and YOPP about her allergies/disability, whether actual and/or perceived.

229. PLAINTIFF LEE requested to be transferred to another room, given her allergy to dogs.

230. At this moment, PLAINTIFF LEE was engaging in protected activity.

231. DEFENDANTS informed PLAINTIFF that they would not accommodate her, could not make any exceptions, and that she would need to stay in the room with the dog or would not have a place to stay altogether.

232. Once again, DEFENDANTS failed to engage in the interactive process as required by the laws.

233. DEFENDANTS disregarded the laws and made no efforts to engage in an interactive process with PLAINTIFF LEE.

234. Due to DEFENDANTS' refusal to accommodate PLAINTIFF LEE, PLAINTIFF LEE was forced to share the room with the dog, despite disclosing her disability, whether actual and/or perceived.

235. It would have created no hardship for DEFENDANTS to assign PLANTIFF LEE to another room without a dog. But same was too much for DEFENDANTS.

236. Then, due to her request for accommodations and resultant health/allergy issues about which she complained, DEFENDANTS then referred to PLAINTIFF LEE as, ***"a problem"*** and, shortly after, on September 8, 2026, DEFENDANTS unlawfully terminated PLAINTIFF LEE'S employment.

237. At that moment, it became clear that DEFENDANTS were retaliating against PLAINTIFF LEE solely due to her disability, whether actual and/or perceived.

**Defendants' Unlawful Termination of PLAINTIFFS**

238. On Friday, September 11, 2026, DEFENDANTS were expected to pay PLAINTIFFS their first paycheck.

239. That morning, PLAINTIFFS noticed that no one had been paid and decided to contact DEFENDANTS to inquire about their unpaid wages.

240. At around noon, PLAINTIFFS approached the director of DEFENDANT MOMENTUM, DEFENDANT DIAZ, and the manager, Mr. Garcia.

241. Sam Montville, acting as PLAINTIFFS' voice, raised several concerns, including but not limited to DEFENDANTS' failure to pay them wages and overtime, the poor living conditions, the lack of basic necessities, and discriminatory treatment that some of PLAINTIFFS were experiencing.

242. DEFENDANT DIAZ became visibly upset and left the room.

243. Mr. Garcia stayed in the room and attempted to address PLAINTIFFS' complaints.

244. PLAINTIFFS waited in the conference room to see whether the situation could be resolved.

245. A couple of hours later, DEFENDANT DIAZ returned to the conference room and told

PLAINTIFFS, ***"guess what, you all [are] fired."***

246. PLAINTIFFS were shocked that they were all being fired as soon as they raised concerns about DEFENDANTS' unlawful and discriminatory treatment towards them during their employment as political canvassers on behalf of DEFENDANT LAWLER.

247. DEFENDANTS failed to give any reason why PLAINTIFFS were being terminated and instructed them to return all of the equipment they received during their employment at DEFENDANTS.

248. At that moment, it became clear that DEFENDANTS wrongfully terminated PLAINTIFFS because they engaged in protected activity, complained about unpaid wages and overtime, poor living conditions and discriminatory treatment.

249. At all relevant times, PLAINTIFFS were promised compensation between $1,200 to $3,000 per week, together with housing and covered travel expenses, through Election Day, November 3, 2026.

250. DEFENDANTS breached the terms and conditions of the PLAINTIFFS' employment by failing to honor their compensation and reimbursement agreements.

251. At all relevant times, DEFENDANTS failed to pay PLAINTIFFS the compensation they had been promised, or at least, the minimum wage and overtime as required by the FLSA and New York Labor Law.

252. Instead, DEFENDANTS wrongfully terminated PLAINTIFFS' employment nearly eight weeks before the agreed-upon end date of November 3, 2026.

**Defendants' Failure to Lawfully Pay PLAINTIFFS**

253. PLAINTIFFS worked six (6) to seven (7) days, from Thursday, September 3 through Thursday, September 10, 2026.

254. DEFENDANT YOPP required PLAINTIFFS to attend a meeting in the hotel lobby at 8:00 a.m. or 8:30 a.m. each morning, lasting approximately 15 to 30 minutes, at which she set the goals for the day and assigned duties. This pre-shift meeting was unpaid.

255. At all relevant times, DEFENDANT YOPP exercised managerial supervision over PLAINTIFFS' work.

256. After the meeting, PLAINTIFFS drove to their assigned territories.

257. This was not commuting to work as PLAINTIFFS were already at work from the hotel, especially because they all had to attend a morning conference at the hotel and were then dispatched to locations from there. Thus, travelling from the hotel to the location(s) was part of their daily job functions and job responsibilities.

258. Then, after knocking on doors until late at night, PLAINTIFFS drove about 30 minutes back to their lodging in Yonkers.

259. This was not commuting from work either, as DEFENDANT YOPP then required PLAINTIFFS to attend an evening meeting at the hotel after their field work to discuss issues encountered during the day.

260. This post-shift meeting was also unpaid.

261. PLAINTIFFS therefore worked approximately seventy (70) to eighty-four (84) hours per week each.

262. At all relevant times, DEFENDANTS failed to pay PLAINTIFFS the minimum wage for all the hours they worked at DEFENDANTS, as required by the FLSA and New York Labor Law.

263. At all relevant times, DEFENDANTS failed to pay any overtime premium to PLAINTIFFS for all hours worked over forty (40) in a workweek.

264. Indeed, to date, some of PLAINTIFFS have not received any payment for their work at all.

265. Further, DEFENDANTS did not provide PLAINTIFFS with the Notice and Acknowledgement of Payrate and Payday under N.Y. Lab. Law § 195.1 when they were hired or at any point in their employment.

266. DEFENDANTS did not provide PLAINTIFFS with any wage statements under N.Y. Lab Law § 195.3 with every wage payment.

267. By DEFENDANTS failing to provide PLAINTIFFS with the Notice and Acknowledgement of Payrate and Payday and accurate wage statements with every wage payment, DEFENDANTS willfully denied PLAINTIFFS the information needed to determine whether they were being paid in accordance with the Labor Law's minimum wage requirements.

268. Had DEFENDANTS provided PLAINTIFFS with the Notice and Acknowledgement of Payrate and Payday and accurate wage statements with every wage payment, PLAINTIFFS would have had enough information to demonstrate that throughout their employment(s) they were not being paid a minimum wage in accordance with the Labor Law.

269. PLAINTIFFS suffered mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, adverse employment actions, loss of employment, loss of employment benefits, loss of medical coverage, prolonged unemployment, inconvenience, loss of employment opportunities, humiliation, special damages, exacerbated physical conditions/injuries, stress, anxiety, embarrassment, and emotional distress.

270. PLAINTIFFS also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

271. DEFENDANTS' conduct was malicious, willful, outrageous, and conducted with full

knowledge of the law.

272. As such, PLAINTIFFS demand Punitive Damages as against all DEFENDANTS.

**FIRST CAUSE OF ACTION UNDER**
**FAIR LABOR STANDARDS ACT, UNPAID MINIMUM WAGE**
**(Against All DEFENDANTS)**

273. PLAINTIFFS repeat and reallege each allegation of the preceding paragraphs with the same force and effect as though fully set forth here.

274. DEFENDANTS violated the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 206(a), by failing to pay PLAINTIFFS at least $7.25 per hour for all hours worked.

275. This conduct is a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

276. PLAINTIFFS are entitled to recover their unpaid minimum wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action.

**SECOND CAUSE OF ACTION UNDER**
**FAIR LABOR STANDARDS ACT, UNPAID OVERTIME**
**(Against All DEFENDANTS)**

277. PLAINTIFFS repeat and reallege each allegation of the preceding paragraphs with the same force and effect as though fully set forth here.

278. DEFENDANTS violated the FLSA overtime rights of PLAINTIFFS by failing to pay overtime premiums of one and one-half (1.5) times their regular rates for all hours worked over forty (40) per week, in violation of 29 U.S.C. §§ 207(a)(1) and 215(a)(2).

279. This conduct is a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

280. PLAINTIFFS are entitled to recover their unpaid overtime premium compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action.

**THIRD CAUSE OF ACTION UNDER**
**FAIR LABOR STANDARDS ACT, RETALIATION**
**(Against All DEFENDANTS)**

281. PLAINTIFFS repeat and reallege each allegation of the preceding paragraphs with the same force and effect as though fully set forth here.

282. On September 11, 2026, PLAINTIFFS complained to DEFENDANTS about their unpaid wages.

283. PLAINTIFFS' complaints were protected activity under the FLSA.

284. Within hours, DEFENDANTS and their agents retaliated against PLAINTIFFS by terminating their employment, in violation of 29 U.S.C. § 215(a)(3).

285. PLAINTIFFS have suffered damages, including loss of wages, and are entitled to compensatory and other damages, punitive damages, reasonable attorneys' fees and costs, and other appropriate relief.

**FOURTH CAUSE OF ACTION UNDER**
**NEW YORK LABOR LAW, UNPAID MINIMUM WAGE**
**(Against All DEFENDANTS)**

286. PLAINTIFFS repeat and reallege each allegation of the preceding paragraphs with the same force and effect as though fully set forth here.

287. DEFENDANTS are "employers" under NYLL §§ 190, 651(5), and 652 and the supporting New York State Department of Labor Regulations. PLAINTIFFS were employed by DEFENDANTS within the meaning of NYLL §§ 2 and 651.

288. Under NYLL § 652, DEFENDANTS were required to pay PLAINTIFFS a minimum wage of no less than seventeen dollars ($17.00) per hour.

289. DEFENDANTS willfully violated the NYLL by knowingly failing to pay PLAINTIFFS the minimum wage for all hours worked, including pre-shift and post-shift meetings and travel

time.

290. PLAINTIFFS are entitled to recover their unpaid wages, liquidated damages, reasonable attorneys' fees, costs, and pre- and post-judgment interest under NYLL §§ 663(1) et seq.

**FIFTH CAUSE OF ACTION UNDER**
**NEW YORK LABOR LAW, UNPAID OVERTIME**
**(Against All DEFENDANTS)**

291. PLAINTIFFS repeat and reallege each allegation of the preceding paragraphs with the same force and effect as though fully set forth here.

292. DEFENDANTS willfully violated the rights of PLAINTIFFS by failing to pay overtime compensation at a rate of at least one and one-half (1.5) times the regular rate for hours worked over 40 each week, in violation of the NYLL and its regulations.

293. PLAINTIFFS are entitled to recover their unpaid overtime compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements under NYLL §§ 663(1) et seq.

**SIXTH CAUSE OF ACTION UNDER**
***NYLL § 215 - RETALIATION***
**(Against All DEFENDANTS)**

294. PLAINTIFFS repeat and reallege each allegation of the preceding paragraphs with the same force and effect as though fully set forth here.

295. PLAINTIFFS attempted to enforce their rights under the NYLL by complaining about unpaid wages.

296. PLAINTIFFS' actions were protected activity under NYLL § 215.

297. DEFENDANTS retaliated against PLAINTIFFS by terminating their employment the same day. They thereby reduced PLAINTIFFS' income, in violation of NYLL § 215.

298. Under NYLL § 215(b), notice of this cause of action was served on the Attorney General.

299. PLAINTIFFS are entitled to compensatory and other damages, punitive damages, reasonable attorneys' fees and costs, and other appropriate relief.

**SEVENTH CAUSE OF ACTION UNDER**
**NEW YORK LABOR LAW § 195(3), WAGE STATEMENT VIOLATIONS**
**(Against All DEFENDANTS)**

300. PLAINTIFFS repeat and reallege each allegation of the preceding paragraphs with the same force and effect as though fully set forth here.

301. DEFENDANTS willfully failed to give PLAINTIFFS an accurate statement of wages with every payment, as NYLL, Article 6, § 195(3) requires.

302. That failure harmed PLAINTIFFS by denying them the information they needed to determine whether they were being paid as the law requires.

303. PLAINTIFFS are entitled to recover two hundred fifty dollars ($250.00) for each workday that the violations occurred, up to a maximum of five thousand dollars ($5,000.00) per employee, under NYLL § 198(1-d), together with reasonable attorneys' fees, costs, and injunctive and declaratory relief.

**EIGHTH CAUSE OF ACTION UNDER**
**NEW YORK LABOR LAW § 195(1), WAGE NOTICE VIOLATIONS**
**(Against All DEFENDANTS)**

304. PLAINTIFFS repeat and reallege each allegation of the preceding paragraphs with the same force and effect as though fully set forth here.

305. DEFENDANTS willfully failed to give PLAINTIFFS the notice NYLL, Article 6, § 195(1) requires. That notice must state the employee's rate or rates of pay and the basis thereof, the regular pay day, the name of the employer, the employer's physical address and telephone number, and other required information.

306. PLAINTIFFS are entitled to recover fifty dollars ($50.00) for each workday that the

violations occurred, up to a maximum of five thousand dollars ($5,000.00) per employee, under NYLL § 198(1-b), together with reasonable attorneys' fees, costs, and injunctive and declaratory relief.

**NINTH CAUSE OF ACTION UNDER**
**THE NEW YORK STATE HUMAN RIGHTS LAW**
**HOSTILE WORK ENVIRONMENT BASED ON RACE, AGE, RELIGION, AND DISABILITY**
**(Against the CORPORATE DEFENDANTS)**

307. PLAINTIFFS SCOTT, BELL, GIBBS, HURTTE-REID, EVANS, BURKE, E. BROWN, and LEE repeat and reallege the preceding paragraphs.

308. NYS Executive Law § 296(1)(a) makes it an unlawful discriminatory practice for an employer, because of an individual's **age, race, creed**, color, national origin, or **disability**, to discriminate against that individual in compensation or in terms, conditions or privileges of employment.

309. The CORPORATE DEFENDANTS are employers under the statute.

310. At all relevant times, PLAINTIFFS EVANS, BELL, BURKE, HURTTE-REID, E. BROWN, and SCOTT are Black/African American.

311. Because of PLAINTIFFS' race, they were subjected to DEFENDANT DIAZ'S statements that the job was so easy that "*even monkeys can do it*" and that he feels *"like he's surrounded by a group of monkeys*."

312. PLAINTIFFS BURKE and HURTTE-REID were subjected to age-based remarks, including "*the geriatric crew*," "*You move too slow. You're too big," "too old, too fat, and unhealthy*," and "*we don't want them in Florida*."

313. Because of PLAINTIFFS' ages, they were excluded from the Tampa contract.

314. PLAINTIFF HURTTE-REID disclosed physical disabilities, whether actual and/or

perceived. DEFENDANTS did not accommodate PLAINTIFF HURTTE-REID despite her request for reasonable accommodations. PLAINTIFF LEE also disclosed her disability, whether actual and/or perceived, a severe dog allergy. DEFENDANTS denied a room transfer and called her *"a problem."* The next day, PLAINTIFF LEE was terminated.

315. These acts made up a hostile work environment permeated with discriminatory insult and ridicule based on race, age, religion, and disability. The CORPORATE DEFENDANTS' managers carried it out, and the CORPORATE DEFENDANTS allowed it to continue unremedied.

316. DEFENDANTS' conduct against these PLAINTIFFS was motivated by their legally protected characteristics.

317. DEFENDANTS had no good faith business justification for their conduct.

318. PLAINTIFFS suffered mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, adverse employment actions, loss of employment, loss of employment benefits, loss of medical coverage, prolonged unemployment, inability to address her medical needs or the medical needs of her child, loss of employment opportunities, humiliation, special damages, exacerbated physical conditions/injuries, stress, anxiety, embarrassment, and emotional distress.

319. PLAINTIFFS have also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

320. DEFENDANTS' conduct was malicious, willful, outrageous, and conducted with full knowledge of the law.

321. As such, PLAINTIFF demands Punitive Damages as against all DEFENDANTS.

**TENTH CAUSE OF ACTION FOR RETALIATION**
**UNDER THE NEW YORK STATE HUMAN RIGHTS LAWS**
**(All Named PLAINTIFF Against All DEFENDANTS)**

322. PLAINTIFFS repeat and reallege all allegations stated above.

323. New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: *"For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."*

324. On Friday, September 11, 2026, PLAINTIFFS contacted DEFENDANTS to inquire about their unpaid wages.

325. At around noon, PLAINTIFFS approached the director of DEFENDANT MOMENTUM, DEFENDANT DIAZ, and the manager, Mr. Garcia.

326. PLAINTIFFS raised several concerns, including but not limited to DEFENDANTS' failure to pay them wages and overtime, the poor living conditions, the lack of basic necessities, and discriminatory treatment that some of PLAINTIFFS were experiencing.

327. PLAINTIFFS were engaging in protected activities.

328. DEFENDANT DIAZ became visibly upset and left the room after hearing PLAINTIF'S complaints.

329. To DEFENDANT DIAZ, PLAINTIFFS were a nuisance due to the engagement in protected activities.

330. Only a couple of hours following their complaint, DEFENDANT DIAZ told PLAINTIFFS, ***"guess what, you all [are] fired."***

331. This was in direct retaliation for their engagements in protected activities.

332. DEFENDANT GARCIA was acting in his official capacity on behalf of all

DEFENDANTS when he retaliated against PLAINTIFFS herein.

333. But for Named PLAINTIFF'S engagements in protected activities, PLAINTIFF would not have been wrongfully terminated.

334. DEFENDANTS had no good faith business justification for their conduct.

335. PLAINTIFFS suffered mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, adverse employment actions, loss of employment, loss of employment benefits, loss of medical coverage, prolonged unemployment, inability to address her medical needs or the medical needs of her child, loss of employment opportunities, humiliation, special damages, exacerbated physical conditions/injuries, stress, anxiety, embarrassment, and emotional distress.

336. PLAINTIFFS have also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

337. DEFENDANTS' conduct was malicious, willful, outrageous, and conducted with full knowledge of the law.

338. As such, PLAINTIFF demands Punitive Damages as against all DEFENDANTS.

**ELEVENTH CAUSE OF ACTION UNDER**
**THE NYS HUMAN RIGHTS LAW-AIDER AND ABETTOR LIABILITY**
***(Against INDIVIDUAL DEFENDANTS DIAZ and YOPP)***

339. PLAINTIFFS SCOTT, BELL, GIBBS, HURTTE-REID, EVANS, BURKE, and E. BROWN repeat and reallege the preceding paragraphs.

340. New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice "[f]or any person to aid, abet, incite, compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

341. DEFENDANT DIAZ directly participated in the discriminatory conduct. He made the racial

remarks and refused to accommodate PLAINTIFF HURTTE-REID and LEE due to their disabilities, whether actual and/or perceived.

342. DEFENDANT DIAZ called PLAINTIFF LEE "*a problem*" due to her disabilities and request for accommodations and wrongfully terminated her shortly after PLAINTIFF LEE requested reasonable accommodations.

343. DEFENDANT YOPP directly participated in the discriminatory conduct. DEFENDANT YOPP excluded PLAINTIFFS BURKE and HURTTE-REID from the Florida contract due to their ages and made age-based remarks, including but not limited to "*the geriatric crew*".

344. DEFENDANT YOPP also made religion-based remarks to PLAINTIFFS BURKE and HURTTE-REID and referred to them as "*the ladies with the head wraps*," due to their religious beliefs.

345. INDIVIDUAL DEFENDANTS DIAZ and YOPP used their positions and authority to subject PLAINTIFFS to the treatment described above. But for those positions, they could not have carried out the discriminatory conduct.

346. INDIVIDUAL DEFENDANTS DIAZ and YOPP are individually liable for aiding and abetting the discrimination of their employer, and PLAINTIFFS are entitled to the maximum damages allowed under this law.

347. PLAINTIFFS suffered mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, adverse employment actions, loss of employment, loss of employment benefits, loss of medical coverage, prolonged unemployment, inability to address her medical needs or the medical needs of her child, loss of employment opportunities, humiliation, special damages, exacerbated physical conditions/injuries, stress, anxiety, embarrassment, and emotional distress.

348. PLAINTIFFS have also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

349. DEFENDANTS' conduct was malicious, willful, outrageous, and conducted with full knowledge of the law.

350. As such, PLAINTIFFS demand Punitive Damages as against all DEFENDANTS.

**TWELFTH CAUSE OF ACTION UNDER**
**FOR DISCRIMINATION UNDER 42 U.S.C. § 1981**
**(Against all Corporate DEFENDANTS and INDIVIDUAL DEFENDANT DIAZ)**

351. PLAINTIFFS SCOTT, BELL, GIBBS, HURTTE-REID, EVANS, BURKE, E. BROWN, and LEE repeat and reallege the preceding paragraphs.

352. 42 U.S.C. § 1981 states in relevant part as follows:

> (a) Statement of equal rights
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) "Make and enforce contracts" defined
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> 42 U.S.C. § 1981

353. PLAINTIFFS SCOTT, BELL, GIBBS, HURTTE-REID, EVANS, BURKE, E. BROWN, and LEE are Black/African American, who were discriminated against because of their

race/color as provided under 42 U.S.C. § 1981 and have suffered damages as set forth herein.

354. Because of PLAINTIFFS' race, they were subjected to DEFENDANT DIAZ'S statements that the job was so easy that "*even monkeys can do it*" and that he feels *"like he's surrounded by a group of monkeys*."

355. PLAINTIFFS SCOTT, BELL, GIBBS, HURTTE-REID, EVANS, BURKE, E. BROWN, and LEE were subjected to a hostile work environment and/or a workplace that was permeated with racial bias, racially motivated insults, racial animus, and derogatory racially motivated language against African Americans, insult, ridicule, and humiliation, by DEFENDANTS.

356. DEFENDANTS had no good faith business justification for the actions alleged herein.

357. As a result of the acts and conduct complained of herein, PLAINTIFFS have suffered, and will continue to suffer, loss of employment, loss of employment opportunities, prolonged unemployment, future loss of income/wages, loss of salary, loss of employment, special damages, inconvenience, loss of bonuses, benefits and other compensation which such employment entails, loss of enjoyment of life, humiliation, depression, anxiety, fear, anger, emotional pain and suffering, and other non-pecuniary losses.

358. PLAINTIFFS are entitled to the maximum amount allowed under this statute/law.

**THIRTEENTH CAUSE OF ACTION UNDER**
**NEW YORK COMMON LAW -BREACH OF CONTRACT**
**(Against all DEFENDANTS)**

359. PLAINTIFFS repeat and reallege each allegation of the preceding paragraphs with the same force and effect as though fully set forth here.

360. DEFENDANTS, through their agent DEFENDANT YOPP, offered PLAINTIFFS

employment as political canvassers on DEFENDANT LAWLER'S 2026 re-election campaign.

361. DEFENDANTS' employment offers included compensation between $1,200 to $3,000 per week, together with housing and covered travel, from the beginning of September 2026 through Election Day, November 3, 2026.

362. DEFENDANTS' promised compensation was later confirmed in the flyer bearing the name of DEFENDANT LAWLER.

363. Under the promised compensation, PLAINTIFFS accepted the job offer and its terms.

364. PLAINTIFFS traveled to New York from their home states.

365. DEFENDANTS breached the agreement in several ways. DEFENDANTS did not pay PLAINTIFFS the promised compensation and terminated their employment nearly eight weeks before the agreed-upon end date of November 3, 2026.

366. Instead, DEFENDANTS paid PLAINTIFFS only a fraction of the promised wages. These wages fell well below the New York minimum wage of $17.00 per hour and, for most of PLAINTIFFS, below the federal minimum wage of $7.25 per hour. DEFENDANTS failed to pay the required overtime premium for any hours worked in excess of forty (40) in a work week.

367. DEFENDANTS also failed to reimburse PLAINTIFFS for vehicle rentals, fuel, and other travel expenses that DEFENDANTS had promised to cover.

368. As a direct result, PLAINTIFFS suffered damages, including unpaid compensation at the agreed rates, unreimbursed travel expenses, vehicle rental and fuel expenses, and loss of the benefit of the promised engagement.

**FOURTEENTH CAUSE OF ACTION**
**FRAUDULENT INDUCEMENT / FRAUD**
**(*Against All Defendants*)**

369. PLAINTIFFS repeat and reallege each allegation of the preceding paragraphs with the same force and effect as though fully set forth here.

370. DEFENDANTS, collectively and individually, placed advertisements and engaged in recruitment efforts to obtain campaign canvassers.

371. DEFENDANTS, collectively and individually, made verbal and written promises to PLAINTIFFS to employ PLAINTIFFS at a specific pay-rate, to provide PLAINTIFFS with travel and transportation for their work, to provide adequate living accommodations and arrangements for PLAINTIFFS during their work, among other things.

372. At the time, DEFENDANTS were aware that they were not going to adhere to their stated promises to PLAINTIFFS and intended to induce PLAINTIFFS to change their positions, travel across the country, and to report to New York State for work under specified employment terms and conditions.

373. DEFENDANTS were aware that PLAINTIFFS would change their positions and travel to New York to work for DEFENDANTS under the conditions DEFENDANTS specifically promised.

374. PLAINTIFFS did, in fact, change their positions, put off their own affairs and potential employment opportunities, incurred expenses, and travelled to New York for work and/or to work for DEFENDANTS in reliance upon DEFENDANTS' promises.

375. Once PLAINTIFFS arrived in New York and were ready, willing, and able to work, DEFENDANTS informed them of a bait a switch and changed all the material terms and conditions of the employment offers to PLAINTIFFS.

376. DEFENDANTS also made it known to PLAINTIFFS that they would not reimburse PLAINTIFFS for travel expenses DEFENDANTS caused PLAINTIFFS to incur as promised to PLAINTIFFS.

377. DEFENDANTS did not adhere to their promises concerning lodging and the safety of PLAINTIFFS.

378. Though DEFENDANTS expected PLAINTIFFS to fulfill their employment obligations to DEFENDANTS, DEFENDANTS never intended to fulfill their promises or obligations to PLAINTIFFS.

379. After using PLAINTIFFS, DEFENDANTS then wrongfully terminated PLAINTIFFS without satisfying any of their promises or obligations to PLAINTIFFS.

380. At all times, DEFENDANTS knew that their actions would cause PLAINTIFFS to rely on their promises and would induce PLAINTIFFS to change their respective positions.

381. PLAINTIFFS suffered mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, adverse employment actions, loss of employment, loss of employment benefits, loss of medical coverage, prolonged unemployment, inability to address her medical needs or the medical needs of her child, loss of employment opportunities, humiliation, special damages, exacerbated physical conditions/injuries, stress, anxiety, embarrassment, and emotional distress.

382. PLAINTIFFS have also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

383. DEFENDANTS' conduct was malicious, willful, outrageous, and conducted with full knowledge of the law.

384. As such, PLAINTIFFS demand Punitive Damages as against all DEFENDANTS.

**FIFTEENTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
***(Against All Defendants)***

385. PLAINTIFFS repeat and reallege each allegation of the preceding paragraphs with the same force and effect as though fully set forth here.

386. DEFENDANTS, collectively and individually, placed advertisements and engaged in recruitment efforts to obtain campaign canvassers.

387. DEFENDANTS, collectively and individually, made verbal and written promises to PLAINTIFFS to employ PLAINTIFFS at a specific pay-rate, to provide PLAINTIFFS with travel and transportation for their work, to provide adequate living accommodations and arrangements for PLAINTIFFS during their work, among other things.

388. At the time, DEFENDANTS were aware that they were not going to adhere to their stated promises to PLAINTIFFS and intended to induce PLAINTIFFS to change their positions, travel across the country, and to report to New York State for work under specified employment terms and conditions.

389. DEFENDANTS were aware that PLAINTIFFS would change their positions and travel to New York to work for DEFENDANTS under the conditions DEFENDANTS specifically promised.

390. PLAINTIFFS did, in fact, change their positions, put off their own affairs and potential employment opportunities, incurred expenses, and travelled to New York for work and/or to work for DEFENDANTS in reliance upon DEFENDANTS' promises.

391. Once PLAINTIFFS arrived in New York and were ready, willing, and able to work, DEFENDANTS informed them of a bait a switch and changed all the material terms and conditions of the employment offers to PLAINTIFFS.

392. DEFENDANTS also made it known to PLAINTIFFS that they would not reimburse PLAINTIFFS for travel expenses DEFENDANTS caused PLAINTIFFS to incur as promised to PLAINTIFFS.

393. PLAINTIFFS worked for DEFENDANTS, did what they asked/required, and gave their labor, time, efforts, energies, health, good faith, safety, and lives to DEFENDANTS.

394. DEFENDANTS directly benefitted from the work, labor, time, efforts, energies, good faith, and lives of PLAINTIFFS.

395. After using PLAINTIFFS, DEFENDANTS then wrongfully terminated PLAINTIFFS without satisfying any of their promises or obligations to PLAINTIFFS – including failing to adequately compensate PLAINTIFFS for their resources.

396. PLAINTIFFS were not compensated for their work(s).

397. Equity and good conscience require restitution for PLAINTIFFS as DEFENDANTS were unjustly enriched by PLAINTIFFS' presence, efforts, and labor.

398. PLAINTIFFS suffered mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, adverse employment actions, loss of employment, loss of employment benefits, loss of medical coverage, prolonged unemployment, inability to address her medical needs or the medical needs of her child, loss of employment opportunities, humiliation, special damages, exacerbated physical conditions/injuries, stress, anxiety, embarrassment, and emotional distress.

399. PLAINTIFFS have also suffered future pecuniary losses, emotional pain, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

400. DEFENDANTS' conduct was malicious, willful, outrageous, and conducted with full knowledge of the law.

401. As such, PLAINTIFFS demand Punitive Damages as against all DEFENDANTS.

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFFS respectfully request that this Court grant the following relief:

a. Declaring that DEFENDANTS engaged in unlawful employment practices prohibited by FLSA, the NYLL, the NYSHRL, 42 U.S.C. § 1981;

b. An injunction against DEFENDANTS and their officers, agents, successors, employees, representatives, and all persons acting in concert with them, as provided by law, from engaging in the unlawful practices, policies, and patterns set forth here;

c. Compensatory damages for unpaid minimum wages and overtime under the FLSA and the NYLL;

d. Liquidated damages for DEFENDANTS' willful failure to pay minimum wages and overtime under the FLSA and the NYLL;

e. Fifty dollars ($50.00) per PLAINTIFF and Class Member for each day of violation of NYLL § 195(1), up to $5,000.00 each, under NYLL § 198(1-b);

f. Two hundred fifty dollars ($250.00) per PLAINTIFF and Class Member for each day of violation of NYLL § 195(3), up to $5,000.00 each, under NYLL § 198(1-d);

g. Compensatory, economic, non-economic, and punitive damages, and back and front pay, for DEFENDANTS' retaliation under the FLSA and the NYLL;

h. Compensatory damages, including emotional distress damages, and punitive damages under the NYSHRL;

i. Damages for breach of contract, fraud, unjust enrichment, including unpaid promised compensation and unreimbursed travel expenses, and other promised expenses;

j. An order declaring DEFENDANTS jointly and severally liable;

k. Prejudgment and post-judgment interest;

l. Costs and expenses of this action, together with reasonable attorneys' and expert fees; and

m. Such other and further relief as this Court deems just and proper.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Fed. R. Civ. P. 38(b), PLAINTIFFS demand a trial by jury on all questions of fact the Complaint raises.

Dated: New York, New York
_________, 2026

PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC

By: ______/S/______________
Gregory Calliste, Jr., Esq.
Bayron Flores-Tapia, Esq.
Alexandra Aguilar Fuentes, Esq.
45 Broadway, 28th Floor
New York, NY 10006
T: (212) 248-7431
gcalliste@tpglaws.com
bflorestapia@tpglaws.com
aaguilarfuentes@tpglaws.com
*Attorneys for Plaintiffs*